**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **DULCES ARBOR S. de R.L. de C.V.,** | § | |
| | § | |
| **V.** | § | **A-10-CA-918 LY** |
| | § | |
| **HECTOR DELGADO and BICKERSTAFF** | § | |
| **HEATH DELGADO ACOSTA LLP,** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:     THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

Before the Court are Defendants Hector Delgado and Bickerstaff Heath Delgado Acosta

LLP's Motion for Summary Judgment, filed November 1, 2011 (Clerk's Dkt. #40); Plaintiff Dulces

Arbor S. de R.L. de C.V.'s Response to Defendants' Motion for Summary Judgment, filed

November 15, 2011 (Clerk's Dkt. #51); Defendants' Reply to Plaintiff's Response to Defendants'

Motion for Summary Judgment, filed November 23, 2011 (Clerk's Dkt. #53); Plaintiff's

Supplemental Response to Defendants' Motion for Summary Judgment, filed December 21, 2011

(Clerk's Dkt. #63); Plaintiff's Second Supplemental Response to Defendants' Motion for Summary

Judgment, filed December 29, 2011 (Clerk's Dkt. #66); and Defendants' Reply to Both of Plaintiff's

Supplemental Responses to Defendants' Motion for Summary Judgment, filed January 6, 2012

(Clerk's Dkt. #67).

The motion was referred by United States District Judge Lee Yeakel to the undersigned for

a Report and Recommendation as to the merits of the motion pursuant to 28 U.S.C. § 636(b), Rule

72 of the Federal Rules of Civil Procedure, and Rule 1(d) of Appendix C of the Local Rules of the

United States District Court for the Western District of Texas.  After reviewing the parties' pleadings,

relevant case law, as well as the entire case file, the undersigned issues the following Report and Recommendation to the District Court.

## I.  BACKGROUND

Plaintiff Dulces Arbor S. de R.L. de C.V. ("Dulces Arbor") brings a claim for breach of fiduciary duty against its former attorneys, Hector Delgado ("Delgado"), and the law firm at which he is a partner, Bickerstaff Heath Delgado Acosta LLP ("Bickerstaff Heath").[1] Specifically, Dulces Arbor alleges Delgado breached his fiduciary duty to preserve client confidences; to represent the client with undivided loyalty; to act with absolute perfect candor, openness, and honesty, and without any concealment or deception; as well as to inform the client of matters material to the representation.  Dulces Arbor further alleges that Delgado operated as an agent for Bickerstaff Heath, making Bickerstaff Heath vicariously liable for Delgado's acts. Regarding damages, Dulces Arbor asserts Defendants' breach of fiduciary duty proximately caused it to suffer actual damages in excess of $2.8 million, in the form of lost rent on property it owns.  In addition to its actual damages, Dulces Arbor seeks to recover exemplary damages.

Defendants claim that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law on Plaintiff's claim of breach of fiduciary duty. The parties have filed responsive pleadings and the matter is now ripe for determination.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is

---

[1]Dulces Arbor's Original Complaint and Defendants' Motion for Summary Judgment included other claims, which were not pursued in Dulces Arbor's Amended Complaint.

entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Wise v. E.I. Dupont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir. 1995).  The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir. 1992).

The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 110, 122 (1993).  The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial. *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000).  "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Id*.

## III. RELEVANT EVIDENCE

Dulces Arbor is owned by Arbor Confections, Inc. and Ray and Mark Ducorsky, father and son respectively.  (Ducorsky Decl. ¶ 2).  Dulces Arbor is the owner of a 330,000 square foot building (the "Property") in Ciudad Juarez, Mexico.  *Id.*  Since at least 2004, the lessee of the Property under a lease agreement has been Dulces Blueberry S.A. de C.V. ("Dulces Blueberry").  *Id.*  Until 2007,

Dulces Blueberry was the Mexican candy manufacturer for and subsidiary of a United States Corporation called Blueberry Sales, LLP ("Blueberry Sales"), owned by Ray and Mark Ducorsky as well as Ray's other son, Brad Ducorsky. *Id.* ¶¶ 2-3.

In 2007 Blueberry Sales combined some of its assets with assets of Sweet Ventures, Inc. to form Simply Goodies, LLP ("Simply Goodies"). *Id.* ¶ 6.[2] Blueberry Sales contributed most of the candy manufacturing equipment to Simply Goodies, and Dulces Blueberry remained the lessee of the Property. *Id.* As of 2007, the Property housed in excess of $50 million dollars of candy manufacturing and packaging equipment. *Id.* ¶ 5. This equipment was owned by Blueberry Sales until mid-2007, and a company called Maple Commercial Financial Corp ("Maple") had a security interest in the equipment to secure a loan. *Id.* Companies called Bridge Healthcare Finance, LLC and Bridge Opportunity Finance, LLC (collectively "Bridge") paid approximately $20 million of Blueberry Sale's debt to Maple, and Bridge took a security interest in much of the Equipment. (Ducorsky Decl. ¶ 7).

Dulces Blueberry failed to make certain lease payments to Dulces Arbor, and in early 2008 Dulces Arbor filed suits against Dulces Blueberry in Mexico to collect the unpaid rent ("the Rent suit") and to rescind the Lease. *Id.* ¶ 9. In the Rent suit, the Mexican Court granted Dulces Arbor a judicial lien on certain Dulces Blueberry and/or Simply Goodies equipment. *Id.* ¶ 10. Almost immediately after Dulces Arbor filed the Rent suit, Dulces Blueberry and/or Simply Goodies renewed paying the rent. *Id.*

---

[2]Although it is not explicitly stated, it is implied that these assets included Dulces Blueberry since Mark Ducorsky's Declaration states Blueberry Sales' ownership of Dulces Blueberry ended in mid-2007. (Ducorsky Decl. ¶ 3).

4

Although neither party's pleadings explicitly state what happened next regarding the ownership of Simply Goodies, an email correspondence between Mark Ducorsky and Delgado indicates that Bridge foreclosed on and acquired Simply Goodies.  In his email, Delgado explained his understanding of the situation:

> Blueberry Sales contributed its business and assets to Simply Goodies, LLC for a 49% interest in Simply Goodies. Mars Equities contributed some cash capital for 51%, and Bridge Finance Group provided a large financing facility and took a lien on all the assets of Simply Goodies and on the 51 and 49 % ownership interests in Simply Goodies.
>
> Bridge Finance Group has now foreclosed on the 51/49% interests and Bridge Finance now owns 100% of Simply Goodies through a holding company by the name of SG Holdings DE, LLC.

(Pl. Res. Mot. Sum. J., Ex. 15). Marc Ducorsky responded:

> Blueberry contributed its assets and liabilities the way I understand it, but it remained a separate entity from Simply Goodies owning 49% of Simply Goodies (a/k/a SG). [...]
>
> MARS contributed Warner Candy Co. (a/k/a Sweet Ventures) and some cash; Blueberry contributed Blueberry and some cash. Bridge foreclosed on the Sweet Ventures part, and Brad/Blueberry gave up its shares; I heard, but do not KNOW that Bridge owns 100% of SG through a holding company named as you say.

*Id.*.

In early 2008 Robert Whetten ("Whetten") approached Dulces Arbor to discuss the potential sale of the Property to Whetten and certain unnamed investors.  (Ducorsky Decl. ¶ 12).  Whetten is the Director of Elamex USA, Corp. and Elamex S.A. de C.V. (collectively "Elamex"), which were competitors of Blueberry Sales.  *Id.* ¶ 4.  In September 2008 Whetten recommended that Plaintiff retain Delgado to help effectuate a quick closing and to provide tax advice regarding the sale of the Property.  *Id.* ¶ 13.  Whetten identified Delgado to Mark Ducorsky as an attorney who had been used

in the past.  *Id.*  Mark Ducorsky stated that neither Delgado nor Whetten informed him that Delgado was then providing services to Whetten, to his investors, or to any other entities related to Whetten, including Elamex. (*Id.* ¶ 14).

On or about September 23, 2008, Mark Ducorsky made a telephone call to Delgado in which Delgado mentioned that Delgado had done work for Whetten in the past.  (Pl. Res. Mot. Sum. J., Ex. 2).  Mark Ducorsky interpreted this to mean the relationship was no longer active.  (Ducorsky Decl. ¶ 16).  However, Defendants' billing records indicate Delgado was working with Whetten and David Stewart, C.F.O. of Elamex, on September 22, 2008.  (Pl. Res. Mot. Sum. J., Ex. 4).

On October 6, 2008, Delgado emailed Mark Ducorsky to inform him that Delgado might have a conflict which they should discuss and that there was no conflict if the Ducorskys only wanted tax advice.  (Pl. Res. Mot. Sum. J., Ex. 5).  On October 7, 2008, Delgado spoke with Mark Ducorsky, stating that Whetten wanted Delgado to advise Whetten's group on the tax aspects related to the purchase of the Property.  (Ducorsky Decl. ¶ 19).  Delgado stated he did not perceive any conflict in advising both sides simultaneously and that he would need to speak to Whetten again to confirm that the buyers were also willing to waive the conflict.  *Id.* ¶ 19.  Mark Ducorsky agreed to proceed.  *Id.* ¶¶ 19-20.  Mark Ducorsky stated that any waiver given at that time was solely to allow Delgado to provide Whetten tax information on the purchase of the Property and did not constitute a waiver which would allow Delgado or his firm to act in any way adverse to the Ducorsky family or its entities, including Dulces Arbor.  *Id.* ¶ 20.

Later that day, Delgado emailed Mark Ducorsky stating:

I talked with David Stewart and they have no problem with me working with Raul Prieto on your, your father's and your companies' tax planning and structuring, and related issues. Everyone understands I am not being looked to by anyone to help

negotiate the terms and conditions of the Juarez building sale/purchase transaction
that is currently being negotiated and that my involvement in regard to the Juarez
building sale/purchase will be limited to working with Raul Prieto in regard to tax
planning and structuring and related issues.

(Pl. Res. Mot. Sum. J., Ex. 5).  The next day, Mark Ducorsky emailed his consent to this

arrangement.  (Pl. Res. Mot. Sum. J., Ex. 6).  He also began providing Delgado detailed information

about Dulces Arbor and Blueberry Sales, including financial data, tax history and corporate status.

*Id.*

On or about October 10, 2008, Delgado sent Dulces Arbor an engagement letter (the

"Engagement Letter").  (Pl. Res. Mot. Sum. J., Ex. 7).  With regard to the nature and scope of

representation, the Engagement Letter stated the following:

We understand that while in the future we may from time to time be employed on
other matters; our present relationship is limited to representing and counseling you
in connection with:

•     Tax planning and structuring work in coordination with the Strickler and
      Prieto CPA Firm related to sale of a Mexico manufacturing facility and
      repatriation of the proceeds at the minimum combined Mexico and U.S. tax
      cost.

•     Work related to bringing the Delaware parent corporation into good standing
      for Federal and State purposes.

*Id.*  In the Standard Terms of Engagement, the letter states, "We will at all times act on your behalf

to the best of our ability."  *Id.*  Bickerstaff further represented that it would "strive to represent your

interests professionally and efficiently."  *Id.*  Mark Ducorsky, on behalf of Plaintiff, signed and

returned the engagement letter on October 20, 2008.  (Pl. Res. Mot. Sum. J., Ex. 8).

On October 23, 2008, Dulces Arbor paid Bickerstaff a $5000 retainer.  (Pl. Res. Mot. Sum.

J., Ex. 12).  On October 29, 2008, Mark Ducorsky sent Delgado and another attorney an email in

which Mark Ducorsky emphasized that Delgado was representing Whetten on parts of the transaction and Delgado should not be "put in the middle" by giving him access to certain information. (Pl. Res. Mot. Sum. J., Ex. 17). Delgado responded to this email by stating that he was representing an affiliate of the purchaser in connection with an offer to buy certain assets of Simply Goodies. *Id.* He stated the deals were independent of each other. *Id*.

On November 11, 2008, Mark Ducorsky advised Delgado that the deal for the sale of the Property was dead. (Pl. Res. Mot. Sum. J., Ex. 22). Delgado continued to advise Mark Ducorksy about various issues, despite the Property sale being dead. (Pl. Res. Mot. Sum. J., Ex. 23, 24, and 25). Although Plaintiff asserts Delgado orchestrated a plan allowing Elamex to purchase Simply Goodies' assets in a foreclosure sale, neither party's pleadings explicitly presents the details of the foreclosure sale, except that it occurred on December 8, 2008. (Pl. Res. Mot. Sum. J. at ¶ 61). However, Marc Ducorsky stated that a Simply Goodies equipment foreclosure and asset sale took place, and Bridge was represented by attorney, Jeff Elegant ("Elegant"). (Ducorsky Decl. ¶ 26). Prior to the termination of the deal for the sale of the Property, on November 7, 2008, Delgado spent three hours in discussion with Whetten in preparation for a conference call with Elegant. (Pl. Res. Mot. Sum. J., Ex. 4).

Marc Ducorsky states that in December 2008 Delgado's clients (presumably Whetten and Elamex) took control of Dulces Blueberry, including the Lease and candy-making operations, but have not paid any rent to Dulces Arbor, which Marc Ducorsky states is $132,776 per month. (Ducorsky Decl. ¶ 11). As a result, Marc Ducorsky states Dulces Arbor is owed in excess of $5,516,295.19 for unpaid lease payments. *Id.* Neither party's pleadings explain in detail how this transfer of control occurred; however, Mark Ducorsky stated:

> Delgado's plan and acts were such that his clients [Whetten and Elamex] would purchase the assets of Simply Goodies—making sure in the process that Dulces Arbor did not receive notice of the U.C.C. sales even though a U.C.C. was filed by Dulces Arbor; and as one of the assets of Simply Goodies was the current occupant of the [Property], Dulces Blueberry. Then by purchasing those assets his clients (Whetten and Elamex *et al.)* would control Dulces Blueberry, continue to occupy and produce candy in the [Property], ship it to the U.S. and simply not pay rent. They would then delay things in the Courts of Mexico using every bad faith way possible and in the U.S. simply litigate until such time that Dulces Arbor ran out of funds and funding since Delgado's conduct prevented Dulces Arbor from receiving any rent. His clients would then purchase the [Property] for cents on the dollar—which has already been attempted.

(Ducorsky Decl. ¶ 27).  Mark Ducorsky also stated that Delgado actively participated in obtaining and giving documentation and information to attorneys in Mexico which he knew would then be used against Dulces Arbor and to the benefit of Whetten and Elamex. *Id.* ¶ 31.

In this lawsuit, Plaintiff designated Steven C. James ("James") as an expert.  James' Original Opinion, dated December 7, 2010, as well as James' Supplemental Opinion, dated September 12, 2011, state that Defendants breached their fiduciary duties to Plaintiff and committed professional malpractice.  In the December 7, 2010 opinion, James opines that "Delgado and his law firm did breach their fiduciary duties to their clients" and "[t]he net effect of [Delgado's] deceptive conduct is that other parties he worked with and guided have now taken possession of all of Dulces Blueberry's equipment and the lease, are making candy in the facility on a daily basis, and are not paying Dulces Arbor any lease payments for the facility." (Pl. Res. Mot. Sum. J., Ex. 45).  In the Supplemental Opinion, James opines that, despite the argument that Defendants' narrow scope of representation allowed Delgado and his firm to act in a manner materially and directly adverse to the interests of Plaintiff, James stands firmly behind his original opinion that Defendants breached their fiduciary duties and committed professional malpractice.  (Pl. Res. Mot. Sum. J., Ex. 46).

## IV.  DISCUSSION

In Texas, the elements of a breach of fiduciary duty are: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Cudd Pressure Control Inc. V. Roles*, 382 Fed.Appx. 961, 964 (5th Cir. 2009).  Defendants argue that Plaintiff has failed to present evidence of (1) damages from any alleged breach, (2) causation from any alleged breach, and (3) any breach of fiduciary duty.

### A.      Damages

In its Amended Complaint, Dulces Arbor asserts it has suffered actual damages in excess of $2.8 million in unpaid rent.  (Am. Compl. ¶ 18).  In his Declaration, Mark Ducorsky states that rent is currently $132,776 per month and Dulces Arbor is owed in excess of $5,516,295.19 for unpaid lease payments.  (Ducorsky Decl. ¶ 11).  Defendants argue that Dulces Arbor lacks evidence of damages because Dulces Arbor has provided no objective facts, figures, or data to prove the alleged amount of lost rent.  (Def. Reply to Pl. Res. at 1; Def. Reply to Both Pl. Suppl. Res. at 1).  In support of this claim, Defendants point out Texas law requires that the fact of lost profits and their amount be established with reasonable certainty. *Burkhart Grob Luft und Raumfahrt GmbH & Co. KG v. E-Systems, Inc.*, 257 F.3d 461, 467 (5th Cir. 2001) (citing *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279-80 (Tex. 1994)).

But lost profits are not the same as lost rent.  The "reasonable certainty" standard for proving lost profits is applied because of the inherently variable nature of business profits—particularly where revenues are uncertain or speculative.  *See, e.g., White v. Southwestern Bell Telephone Co., Inc.*, 651 S.W.2d 260, 262 (Tex. 1983) (regarding lost profits in the context a flower business'

10

revenue); *Pena v. Ludwig*, 766 S.W.2d 298, 304 (Tex.App.—Waco 1989, no writ) (regarding lost profits in the context of a hair salon's revenue). Lost rent is neither inherently uncertain nor speculative. What the Defendants are really attacking with regard to rent is the less-than-definitive nature of the lease agreement, and the fact that the lease was between related entities. Defendants are (justifiably) suspicious of the lack of evidence concerning past payments on the lease, the lack of a lease agreement, and whether in fact Plaintiffs have truly lost any rent payments. But the fact that Plaintiffs' evidence might have credibility questions does not make it incompetent summary judgment evidence. Marc Dukorsky, an owner of Plaintiff, has declared under oath that rent under the lease agreement was $132,776 per month and that Dulces Arbor is owed in excess of $5.5 million in unpaid rent. Defendants have submitted no controverting evidence, but instead simply question the validity of Dukorsky's testimony. Questioning a plaintiff's evidence is insufficient to merit the entry of summary judgment. Defendants could no doubt have conducted discovery on the lease issues, and presented their own evidence to rebut Dukorsky's testimony, but they have not done so. With nothing more in the record on this issue, Dukorsky's Declaration is sufficient to defeat the summary judgment motion on the issue of damages.

**B.    Causation**

Plaintiff alleges Defendants' breach of fiduciary duty caused the tenant to stop paying Plaintiff rent under the lease agreement. Defendants argue that expert testimony is necessary to establish causation in this matter and that James' testimony is insufficient to raise a genuine issue of material fact as to whether there was proximate cause that "but for" Defendants' action Plaintiff would not have suffered the alleged damages. Plaintiff responds that Defendants' "but for" standard

11

is erroneous, that Plaintiff is not required to present expert testimony to establish causation, and that, even if it is, James' testimony is sufficient.

Regarding the "but for" standard, "[t]o prevail on a breach of fiduciary duty claim, the plaintiff must prove that the defendant's breach of their fiduciary duties proximately caused the plaintiff's damages." *Finger v. Ray*, 326 S.W.3d 285, 291 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing *Abetter Trucking*, 113 S.W.3d at 508). Proximate cause "encompass[es] causation in fact, which requires proof that the defendant's act or omission was a substantial factor in bringing about the injury, without which the injury would not have occurred." *Finger*, 326 S.W.3d at 291 (citing *Prudential Ins. Co. of Am. V. Jefferson Assocs.*, 896 S.W.2d 156, 161 (Tex. 1995)). As demonstrated in *Finger*, proximate cause encompasses a "without which" or "but for" standard of causation. Defendants are thus correct that Plaintiff must prove that "but for" Defendants' alleged breach, Plaintiff would not have suffered the alleged damages.

Regarding the necessity of expert testimony, Texas law requires "expert testimony on proximate cause in cases where determination of that issue is not one that lay people would ordinarily be competent to make." *Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000) (quoting *Delp v. Douglas*, 948 S.W.2d 483, 495-96 (Tex. App.—Forth Worth 1997) *rev'd in part on other grounds*, 987 S.W.2d 879 (Tex. 1999)). Plaintiff argues the present case is one in which lay people are competent to determine proximate cause because the causal relationship between an attorney's alleged breach of fiduciary duty and client's loss is obvious. The undersigned finds, given the circumstances of this case, a determination of causation is not entirely obvious. For example, it is not obvious that, but for Defendants' breach of fiduciary duty, Plaintiff would not have taken over Dulces Blueberry or withheld rent nonetheless. It seems possible that the foreclosure would have

12

taken place and Elamex would have taken control of the property regardless of Defendants' alleged breach of fiduciary duty. This issue is, however, beside the point because Plaintiff has provided sufficient expert testimony—that of James.

Regarding the sufficiency of James' expert testimony on causation, Defendants argue Plaintiff cannot satisfy the burden of establishing proximate cause with the testimony of James because his testimony barely addresses causation and fails to state Defendants proximately caused Plaintiff's alleged damages. Plaintiff contends James sufficiently addresses causation and cites a portion of James' report where he opines that "Delgado and his law firm did breach their fiduciary duties to their clients" and "[t]he net effect of [Delgado's] deceptive conduct is that other parties he worked with and guided have now taken possession of all of Dulces Blueberry's equipment and the lease, are making candy in the facility on a daily basis, and are not paying Dulces Arbor any lease payments for the facility." (Pl. Res. Mot. Sum. J., Ex. 45).

The undersigned notes that, although James did not use any magic words like "causation," "proximate cause," or "but for," Defendants have not presented any law requiring that an expert use such words. James' expert testimony that the "net effect" of Delgado's conduct resulted in non-payment of rent sufficiently establishes a genuine dispute as to whether there was proximate cause. Thus, the Court finds summary judgment should not be granted on this basis.

## C.     Breach of Fiduciary Duty

Plaintiff alleges Delgado breached his fiduciary duty to preserve client confidences, to represent the client with undivided loyalty; to act with absolute perfect candor, openness, and honesty, and without any concealment or deception; as well as to inform the client of matters material to representation. (Am. Compl.¶¶ 15-16). Defendants argue that Plaintiff has failed to

13

present evidence of a breach of fiduciary duty because under Texas law a lawyer's fiduciary duty only extends to dealings within the scope of the representation, and the alleged breaches were outside the Defendants' limited scope of representation.  Plaintiff responds that Defendants' argument is based on an overly broad interpretation of Texas law and that the law does not permit a lawyer to simultaneously represent a client and also harm that client.  Plaintiff adds that the attorney-client relationship is one of "most abundant good faith" requiring absolute and perfect candor, openness and honesty, and the absence of any concealment or deception.  *Sealed Party v. Sealed Party*, 2006 WL 1207732, at *6 (S.D.Tex. May 4, 2006).

As noted earlier, Defendants' Engagement Letter provided a specific scope of the representation, limited to representing Plaintiffs in tax planning related to the sale of the Juarez facility, as well as on bringing the Delaware parent corporation into good standing.  (Mot. Sum. J. Ex. 3).  The Standard Terms of the letter also states, "We will at all times act on your behalf to the best of our ability," and "strive to represent your interests professionally and efficiently."  *Id.* Defendants assert that, under Texas law, a lawyer does not owe a client a legal duty outside the scope of that lawyer's representation of the client.  In fact, they argue a lawyer may act adversely, on behalf of one client, even as to another current client in a matter unrelated to the current client's scope of representation.  In support of this position, Defendants cite two cases:  *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 159 (Tex. 2004) and *King Ranch, Inc. v. Chapman*, 118 S.W. 3d 742, 752-53 (Tex. 2003).  Plaintiff argues neither case supports this proposition, as Defendants interpret the cases too broadly, and both cases are distinguishable from the present case.

In *Two Thirty Nine* Defendants focus on the statement that "[w]hile it is true that an attorney owes a client a duty to inform the client of matters material to the representation . . . this duty to

14

inform does not extend to matters beyond the scope of the representation." 145 S.W.3d at 160 (citation omitted). In *Two Thirty Nine* William Thau, an attorney at Jenkens & Gilchrist, P.C. ("Jenkens"), represented Two Thirty-Nine Venture ("239 JV") and assisted 239 JV in acquiring and selling acreage in Irving, Texas, which was to be developed for apartments. *Id.* at 154. Thau's partner at Jenkens, Harry Joe ("Joe"), was on the Irving City Council, which imposed a moratorium on apartment construction in Irving shortly before the closing date for the sale of 239 JV's acreage. *Id.* at 155. Joe did not disclose to anyone at Jenkens or 239 JV that the City Council was considering the moratorium. Thereafter, Joe and Thau tried to help 239 JV obtain a waiver from the Council but failed, and the 239 JV's buyer backed out.

239 JV sued Joe and Jenkens alleging negligence and breach of fiduciary duty for: (1) failure to disclose the alleged conflict of interest and (2) failure to disclose matters that were material to Jenken's representation of 239 JV. *Id.* at 156. The Texas Supreme Court held Joe had legislative immunity for his actions and could not be liable for the alleged conflict of interest underlying the breach of fiduciary duty claim. *Id.* at 154. In regard to the argument that Jenkens should have advised 239 JV that the City Council was considering imposing an apartment construction moratorium, the court observed that an attorney does not have a duty to inform a client of matters outside the scope of the representation. *Id.* at 159-160. The Court noted that Jenkens did not represent 239 JV before the City Council, that the moratorium meeting was a matter of public record, and that, as a result, Jenkens did not have a duty to advise 239 JV of the City Council meeting. *Id.*

The Defendants' actions in the present case are distinguishable from those involved in *Two Thirty Nine* because Defendants allegedly orchestrated an event that had an adverse effect on Plaintiff, whereas Jenkens merely failed to inform 239 JV of an event—one that was a matter of

15

public record—that could be adverse to the client's interests.  As Plaintiff notes, the beach of fiduciary duty here is more akin to what Joe did, when he voted in favor of the moratorium; however, unlike Joe, Defendants here do not enjoy any official immunity.

In the other case Defendants rely upon, *King Ranch*, Richard King ("King") and Major William Warren Chapman ("Chapman") each owned a one-half undivided interest in a property. *King Ranch*, 118 S.W. 3d at 746.  Chapman's wife Helen inherited Chapman's interest in the property and sued King for trespass to try title.  *Id.*  Helen was represented by Robert Kleberg ("Kleberg"), whose firm also represented King in two unrelated lawsuits.  *Id.*  The trespass suit was settled after Helen died, but her heirs brought a separate suit alleging Kleberg conspired with King to the detriment of Helen.  *Id.* at 747, 749.  The Texas Supreme Court found that, although Kleberg represented King on unrelated matters at the same time he represented Helen against King, there was no evidence of a fraudulent conspiracy between Kleberg and King, and, therefore, no evidence that Kleberg acted as advocate against Helen.  *Id.* at 758.  Regarding dual representation the Court held:

> [s]uch dual representation is permissible under today's ethical rules . . . *See* Tex. Disciplinary R. Prof'l Conduct 1.06(b), cmt. 11 (noting that "there are circumstances in which a lawyer may act as advocate against a client, for a lawyer is free to do so unless this Rule . . . would be violated"); *Laybourne v. Bray & Shifflett,* 190 S.W. 1159, 1162 (Tex. Civ. App.–Amarillo 1916, no writ) (The "rule prohibiting an attorney once retained by a client from acting for the opposing party applies only in the case of conflicting interest").

*Id.* at 752-53.

The quoted rule, Texas Disciplinary Rules of Professional Conduct Rule 1.06(b) states:

a lawyer shall not represent a person if the representation of that person:

> (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or

> (2) reasonably appears to be or become adversely limited by the lawyer's or
> law firm's responsibilities to another client or to a third person or by the
> lawyer's or law firm's own interests

Tex. Disciplinary R. Prof'l Conduct 1.06(b). Rule 1.06(b)'s Comment 11 clarifies that a lawyer may

act as an advocate against a client so long as the lawyer does not violate Rule 1.06(b). Tex.

Disciplinary R. Prof'l Conduct 1.06(b), cmt. 11. And *Laybourne* stands for the proposition that a

lawyer may act for an opposing party of a client so long as no conflict of interest exists. *Laybourne,*

190 S.W. at 1162. Neither of these exceptions applies in the present case. Unlike the Court's

findings in *King Ranch*, the present case's summary judgment evidence, viewed in the light most

favorable to the Plaintiff, portrays a dual representation involving a substantially related matter in

which the two clients' interests are materially and directly adverse to each other, and a potential

conflict of interest exists. Further, it is unclear that Defendants' alleged breach is truly outside the

scope of their fiduciary duty, even as described in the Engagement Letter. If it is true as alleged that

Delgado used his attorney-client relationship with Plaintiff to obtain information for another client

to harm Plaintiff, a reasonable jury could find that such actions constitute a breach of fiduciary duty

within the scope described in the Engagement Letter.

## IV.  RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the District Court

**DENY** Defendants' Motion for Summary Judgment (Clerk's Dkt. #40).

## V.  OBJECTIONS

The parties may file objections to this Report and Recommendation.  A party filing

objections must specifically identify those findings or recommendations to which objections are

17

being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 U.S. 466, 472-74 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 12th day of April, 2012.


_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE